UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

STATE OF NEW YORK, NEW YORK
STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION,
and BASIL SEGGOS, *Commissioner of
New York State Department of
Environmental Conservation*,                                    18-CV-176 (JLS)

                             Plaintiffs,

              v.

AMERICAN LOCKER GROUP INC.,
*individually and as successor to
Knowles-Fisher Corporation formerly
known as AVM Corporation formerly
known as Automatic Voting Machine
Corp.*, and EDWARD RUTTENBERG,

                             Defendants.

_____

## DECISION AND ORDER

        This is an action arising under the Comprehensive Environmental Response,

Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601-9675 (CERCLA) and

New York common law.  Plaintiffs New York State, New York State Department of

Environmental Conservation (DEC), and Basil Seggos, as Commissioner of the DEC

(collectively, Plaintiffs) filed a complaint on February 2, 2018, against American

Locker Group Inc. (American Locker) and Edward Ruttenberg.  Dkt. 1.  Plaintiffs

moved for final judgment by default.  Dkt. 13.

        Plaintiffs did not serve or otherwise proceed against Defendant Ruttenberg,

and have asked the Court to dismiss all proceedings against him.  Dkt. 13-1, at 2.

Pursuant to Federal Rule of Civil Procedure 41(a)(2), Plaintiffs' claims against Ruttenberg are dismissed without prejudice.

In contrast, pursuant to New York Business Corporation Law § 306, Plaintiffs served American Locker on February 8, 2018, through the New York Secretary of State. Dkt. 7. The Clerk of the Court entered default as to American Locker on August 6, 2018. Dkt. 11. American Locker has failed to appear, answer, or otherwise respond to the complaint.

This Court hereby grants, in part, and denies, in part, Plaintiffs' Motion for Final Judgment by Default (Dkt. 13). The Court enters default judgment with regard to liability and grants Plaintiffs declaratory relief, but requires a hearing to ascertain the amount of damages to which Plaintiffs are entitled.

## BACKGROUND

According to the complaint, Plaintiffs seek to recover past and future costs incurred "in responding to the release . . . of hazardous substances into the environment at and from the premises located at One Industrial Place, Gowanda, New York" (the "Site"). Dkt. 1 ¶ 1; Dkt. 13-1 ¶ 6. The Site is approximately 1.75 acres of industrial/commercial enterprises and structures. Dkt. 1 ¶ 22. Adjacent to the Site are residential properties to the north, Thatcher Creek to the east, and Cattaraugus Creek to the west. *Id.* ¶ 23.

American Locker owned the Site between 1967 and 1979.[1] Dkt. 1 ¶¶ 25, 36. American Locker used the Site as a metal stamping and machine shop. *Id.* ¶ 28. The metal stamping process involved the processing, grinding, and storage of certain metals and scrap metal. *Id.* The process also involved the use of cleaning solvents, such as degreasers, that were spilled, leaked, or disposed of onto the Site during the metal stamping process. *Id.* ¶¶ 29-30. The process generated scrap metal coated with solvents, which American Locker stored on the land's surface uncovered. *Id.* ¶¶ 32-33. Solvents and metal shavings leached from the scrap into the soil and groundwater. *Id.* ¶ 34.

In 1979, American Locker sold the land to Gowanda Electronics Corporation. *Id.* ¶ 36. In 1993, in anticipation of selling the land, Gowanda Electronics conducted an environmental investigation of the Site, which included soil excavations and analysis. *Id.* ¶¶ 40-41. The excavations included seven feet of soil beneath the surface where the scrap metal had been stored. *Id.* ¶ 42. The excavated soils were sampled and found to contain volatile organic compounds (VOCs) that exceeded DEC guidance levels. *Id.* The prominent VOCs detected consisted of three solvents: trichloroethene (TCE), 1,2-dichloroethene (1,2-DCE), and 1,1,1-trichloroethane (1,1,1-TCA). *Id.* ¶ 44. TCE and 1,1,1-TCA are solvents

---

[1] Knowles-Fisher Corporation and its predecessor owned and operated the Site from the 1940s to 1967. *Id.* ¶ 24. American Locker purchased the Site from Knowles-Fisher in 1967. *Id.* ¶ 25. American Locker also purchased Knowles-Fisher's assets and 100 percent of its stock. *Id.* It then liquidated the assets and continued the business operations of Knowles-Fisher as a division of American Locker. *Id.* Both Knowles-Fisher and American Locker used the Site as a metal stamping/machine shop. *Id.* ¶ 28.

commonly used for degreasing and cleaning metal and manufactured parts.  *Id.*
¶ 44.

Gowanda Electronics also conducted a groundwater investigation, which
found elevated levels of VOCs in the groundwater on-Site, resulting in significant
groundwater contamination.  Again, the primary VOCs found were TCE, 1,1,1-TCA,
and 1,2-DCE.  *Id.* ¶ 49.

In 1995, DEC began investigating the subsurface and groundwater conditions
near the area of contamination.  *Id.* ¶ 50.  The investigation identified a
groundwater plume migrating from the source area towards a residential property
on Torrance Place on the northern boundary of the Site.  *Id.*  The data suggested
that the plume likely extended beyond Torrance Place.  *Id.*  As a result of the
investigation, DEC listed the Site in the "Registry of Inactive Hazardous Waste
Disposal Sites in New York State" as a Class 2 site, indicating that it poses a
significant threat to the public health or environment.  *Id.* ¶ 51.

In 1998, DEC issued a Remedial Investigation Report, which found that
excavation and removal of contaminated soils by Gowanda Electronics had been
largely effective.  *Id.* ¶¶ 55, 57.  With regard to the groundwater contamination,
however, the contaminant plume covered approximately 7.5 acres and was
continuing to migrate northward.  *Id.* ¶ 58.  The report also found that the
concentrations of VOCs within the contaminated groundwater plume were
exceptionally high, which indicated that the TCE existed as a dense non-aqueous

phase liquid (DNAPL) that would act as a continuing source of contamination as it slowly dissolved into passing groundwater. *Id.* ¶ 59.

The report also studied soil vapor contamination and found that the same VOCs present in the groundwater plume also were present in air samples collected from off-Site soil above the plume, indicating that the VOCs were evaporating from the water and entering the pore spaces found in the soil above the water table. *Id.* ¶ 60. Indoor air samples were collected in homes located over the groundwater plume and were found to be contaminated from this soil vapor with the VOCs found in the groundwater plume. *Id.* ¶ 61. DEC determined that humans were being exposed to this contamination, and that remediation of the aquifer was necessary to protect human health and the environment. *Id.* ¶¶ 63, 64.

After receiving public comments, DEC issued a Record of Decision on March 30, 2001, selecting a remedy that would "address the significant threat to human health and the environment created by the presence and off-Site migration of hazardous waste disposed at the Site." *Id.* ¶ 68. Specifically, it elected to extract groundwater through pumping wells and a groundwater collection trench; treat and discharge the collected groundwater; and install a reactive iron wall providing treatment of contaminated groundwater beyond the extent of the extraction system. *Id.*

In 2004, DEC began investigating and collecting information required for the design of these activities. *Id.* ¶ 71. In 2004, DEC also installed sub-slab depressurization systems (SSDS) in nearby homes to mitigate indoor air impacts

exceeding New York State Department of Health guidelines. *Id.* ¶ 73.  In 2010, DEC installed a SSDS in a former manufacturing building at the Site. *Id.*

In 2011, new technologies became available for the destruction of chlorinated solvents—specifically In-Situ Chemical Oxidation Injection (ISCO). *Id.* ¶ 74.  DEC decided to evaluate the cost, effectiveness, and feasibility of an ISCO approach as compared to the previously selected remedy of extraction and implementation of an iron wall. *Id.* ¶ 75.  DEC determined that the ISCO approach would be highly effective over a shorter period of time with less disruption to the community. *Id.*

In 2012, DEC conducted a Pilot Study to collect further data regarding the ISCO method and found that it was effective at reducing the amount of chlorinated solvents present in the plume's source area. *Id.* ¶ 76.  In July 2012, from October to November 2013, and from December 2014 to January 2015, DEC implemented a full-scale ISCO remedy at the on-Site source area and northward within the footprint of the contaminated plume. *Id.* ¶ 77.

Engineering and institutional controls continued at the Site, including: continued monitoring of the groundwater and soil vapor; continued operation of the SSDSs; restriction of the Site for commercial or industrial use; an environmental notice providing DEC with access to the Site to evaluate ongoing measures; and reporting requirements. *Id.* ¶ 79.  Plaintiffs spent over $4 million in responding to the release of these VOCs at the Site. *Id.* ¶ 80.

## DISCUSSION

### I.   Default Judgment

To obtain a default judgment under Rule 55(b), a party first must secure the clerk's entry of default by demonstrating, by affidavit or some other means, that the opposing party is in default. *See* Fed. R. Civ. Pro. 55(a); *see also Rochester Laborers' Welfare-S.U.B. Fund by Brown v. Journee Constr., Inc.*, 305 F. Supp. 3d 444, 446 (W.D.N.Y. 2018) (citations omitted). Once default is entered, the allegations of the complaint establishing the defendant's liability are accepted as true, except for those relating to the amount of damages. *See Buffalo Laborers Welfare Fund v. H & M Plumbing and Mech. Contracting Inc.*, No. 14-CV-960S, 2015 WL 1735198, at *1 (W.D.N.Y. Apr. 16, 2015) (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992)); *see also Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981); *Annis v. Eastern Asset Mgmt., LLC*, No. 08-CV-458S, 2010 WL 1035273, at *3 (W.D.N.Y. Mar. 18, 2010).

In considering a default judgment under Rule 55(b), the Court still must determine whether the complaint's well-pleaded allegations state a claim upon which relief can be granted. *See, e.g., Madden v. Bewley*, No. 16-CV-00571, 2017 WL 222245, at *2 (W.D.N.Y. Jan. 18, 2017) (quoting *Granite Music Corp. v. Ctr. St. Smoke House, Inc.*, 786 F. Supp. 2d 716, 726 (W.D.N.Y. 2011)). Once a defendant's liability is established by entry of a default judgment, the only remaining question is whether there is "adequate evidentiary support" for the damages sought. *See id.*

(quoting *Granite Music Corp.*, 786 F. Supp. 2d at 726); *see also Greyhound*, 973 F.2d at 158.

In this case, the Clerk has entered default (Dkt. 11), and Plaintiffs' allegations are sufficient to establish liability under CERCLA and entitlement to restitution for funds Plaintiffs have spent abating the public nuisance resulting from hazardous substances released at the Site.  But for the reasons explained below, the Court is unable to ascertain the proper amount of damages and, therefore, denies that portion of Plaintiffs' motion.

### A.    CERCLA

CERCLA is "a comprehensive federal law governing the remediation of hazardous waste sites." *W.R. Grace & Co.-Conn. v. Zotos Intern., Inc.*, 559 F.3d 85, 88 (2d Cir. 2009).  Its "primary purposes are axiomatic: (1) to encourage the timely cleanup of hazardous waste sites; and (2) to place the cost of that cleanup on those responsible for creating or maintaining the hazardous condition." *Price Trucking Corp. v. Norampac Indus., Inc.*, 748 F.3d 75, 79 (2d Cir. 2014) (internal quotation marks and citation omitted).  The statute "imposes strict liability on owners and facility operators," *id.* at 79-80, and courts "construe CERCLA liberally to advance its dual goals," *New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 220 (2d Cir. 2014).  The statute "creates several distinct provisions that authorize parties in different procedural positions to recover costs incurred in cleaning up contamination: '(1) section 107(a), which permits the general recovery of cleanup and prevention costs; (2) section 113(f)(1), which creates a contribution

right for parties liable or potentially liable under CERCLA; and (3) section

113(f)(3)(B), which creates a contribution right for parties that have resolved their

liability by settlement.'" *W.R. Grace & Co.-Conn.*, 559 F.3d at 89 (quoting *Consol.*

*Edison v. UGI Utils., Inc.*, 423 F.3d 90, 94 (2d Cir. 2005)).

As part of their first cause of action, Plaintiffs assert that American Locker is

liable under Section 107(a). Dkt. 1 ¶ 95. To make out a prima facie case "for

liability under [Section 107(a)], a plaintiff must establish that: (1) the defendant is

an 'owner' or is otherwise liable under 42 U.S.C. § 9607(a)(1)-(4); (2) the site is a

'facility' as defined by 42 U.S.C. § 9601(9); (3) there has been a release or threatened

release of hazardous substances at the facility; (4) the plaintiff incurred costs

responding to the release or the threat; and (5) the costs and response conform to

the National Contingency Plan." *Price Trucking Corp.*, 748 F.3d at 80.

### 1.    Covered Entity and Facility

Plaintiffs have alleged sufficient facts to establish the first and second

elements of a CERCLA claim. As for the first element, a party is a covered entity if

it falls into any of the four categories listed in 42 U.S.C. § 9607(a)(1)-(4); *see also*

*New York v. Town of Clarkstown*, 95 F. Supp. 3d 660, 674 (S.D.N.Y. 2015) ("Four

classes of 'potentially responsible parties' ('PRPs') exist under CERCLA: '(1) present

owners and operators of facilities that accepted hazardous substances for transport;

(2) past owners and operators of such facilities; (3) generators of hazardous

substances; and (4) certain transporters of hazardous substances.'" (quoting

*FirstEnergy Corp.*, 766 F.3d at 220)).

Plaintiffs allege that American Locker falls within the second category of PRPs: a person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed. 42 U.S.C. § 9607(a)(2). Plaintiffs also allege that the Site is a facility, as defined by CERCLA.

The Court begins its analysis by setting forth the numerous statutory definitions that are relevant to these elements.

"Person" is defined to include a corporation. 42 U.S.C. § 9601(21).

"Disposal" is defined by reference to the Solid Waste Disposal Act (the SWDA). *Id.* § 9601(29). The SWDA defines "disposal" as the "discharge, deposit, injection, dumping, spilling, leaking or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

"Solid Waste" under the SWDA is defined in part as "discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations." *Id.* § 6903(27).

"Hazardous substance" is defined in part under CERCLA as any element, compound, mixture, solution, or substances designated pursuant to 42 U.S.C. § 9602, which includes substances listed in Table 302.4 of 40 C.F.R. § 302. 42 U.S.C. § 9601(14); *see New York v. Next Millennium Realty, LLC*, 160 F. Supp. 3d. 485, 508 (E.D.N.Y. 2016).

"Facility" is defined in part as any building, structure, equipment, or any site or area where a hazardous substance has been deposited, stored, disposed of, or placed. 42 U.S.C. § 9601(9).

Plaintiffs have alleged that American Locker is a person, as defined under CERCLA, as it is a publicly traded business corporation organized under the laws of Delaware. Dkt. 1 ¶ 8. Plaintiffs have also sufficiently alleged that a disposal took place during American Locker's ownership and operation of the Site. In particular, Plaintiffs have alleged that American Locker conducted metal stamping operations on the Site during the relevant time period. Dkt. 1 ¶ 28. As part of its metal stamping processes, cleaning solvents spilled or leaked onto and contaminated the soil and groundwater on the Site. Dkt 1 ¶¶ 28-31. Plaintiffs also allege that American Locker and its predecessors stored scrap metals on the land surface uncovered, and that "[s]olvents and metal shavings adhering to the surface of the scrap metals were washed off by precipitation or otherwise leached from the scrap, causing their release into the soil and groundwater." Dkt. 1 ¶¶ 33-34. These facts establish that the solvents and metal shavings were solid waste as they were discarded material resulting from American Locker's industrial operations. And such solid waste was disposed of when it was discharged, spilled, leaked, or placed onto the Site's land such that it entered into the environment.

Plaintiffs also sufficiently allege that, because those cleaning solvents and scrap metals were disposed into the environment, hazardous substances were found in the soil and groundwater. Specifically, investigations found within the soil and

- 11 -

groundwater significant levels of certain VOCs listed in Table 302.4—classifying them as hazardous substances.  Dkt. 1 ¶¶ 42, 49; *see* 40 C.F.R. § 302.4.

Plaintiffs assert that those VOCs are "solvents commonly used for degreasing and cleaning metal and manufacturing parts, which is consistent with Knowles-Fischer's and American Locker's operations on the Site."  Dkt. 1 ¶¶ 42-44, 49. Plaintiffs, therefore, sufficiently allege that hazardous substances were disposed at the Site while American Locker owned and operated it.  *See Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 131 (2d Cir. 2010) ("When determining CERCLA liability, there is nothing objectionable in basing findings solely on circumstantial evidence, especially where the passage of time has made direct evidence difficult or impossible to obtain.") (internal quotation marks and citation omitted); *S & K Commack Dev., LLC v. Hasn Dry Cleaners, Inc.*, No. 13-CV-5297 SJF ARL, 2015 WL 4139357, at \*9 (E.D.N.Y. July 9, 2015) (finding, on motion for default judgment, that the defendants were "PRPs under CERCLA, insofar as plaintiff has established that they conducted dry cleaning activities on the Site, resulting in the disposal of perc, a hazardous waste, on the Site, during the relevant time period").

Additionally, Plaintiffs have sufficiently alleged that the Site is a "facility" under CERCLA because it is a site where hazardous substances have been deposited, stored, disposed of, or placed.  *See Brooklyn Union Gas Co. v. Exxon Mobil Corp.*, 480 F. Supp. 3d 430, 441 (E.D.N.Y. 2020) ("Courts have interpreted 'facility' [as defined in CERCLA] broadly." (collecting cases)).

In sum, Plaintiffs have sufficiently alleged that American Locker is a person who owned and operated the Site at the time hazardous substances were disposed of on the facility.

### 2.      Release of Hazardous Substances

Plaintiffs also have set forth sufficient allegations to satisfy the third element—that a release of hazardous substances occurred at the facility.

CERCLA defines a "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." 42 U.S.C. § 9601(22).[2]

As described above, Plaintiffs have alleged that VOCs—classified as hazardous substances—spilled, leaked, or leached into the land, soil, and groundwater at the Site.  Thus, Plaintiffs have met their burden regarding the third element.

### 3.      Costs Incurred and the National Contingency Plan

Lastly, Plaintiffs have also pled sufficient facts to satisfy the fourth and fifth elements regarding incurred costs and conformity with the National Contingency Plan.  A PRP is responsible for "all costs of removal or remedial action incurred by

---

[2] The definition of "release" also contains exclusions, including: (1) releases which result in exposure to persons solely within a workplace, (2) emissions from engine exhaust; (3) certain releases relating to nuclear incidents; and (4) the normal application of fertilizer.  42 U.S.C. § 9601(22).  None of these exclusions apply here.

the United States Government or a State or an Indian tribe not inconsistent with

the National Contingency Plan." 42 U.S.C. § 9607(a)(4)(A).

In general, "response costs are liberally construed under" CERCLA. *W.R.*

*Grace & Co.-Conn. v. Zotos Int'l, Inc.*, 559 F.3d 85, 92 (2d Cir. 2009). This includes

indirect costs. *See, e.g., United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1250 (9th

Cir. 2005) (noting that "'[a]ll costs' include indirect costs such as administrative and

other overhead costs incurred in managing the greater Superfund program"), *cert.*

*denied*, 549 U.S. 951 (2006).

"Removal" actions involve the clean-up or removal of released hazardous

substances, which may be necessary to prevent, minimize, or mitigate damage to

the public health or welfare or to the environment that may otherwise result from

the release. 42 U.S.C. § 9601(23). This includes "such actions as may be necessary

to monitor, assess, and evaluate the release" of hazardous substances. *Id.*

"Remedial action" refers to "actions consistent with the permanent remedy

taken instead of or in addition to removal actions in the event of a release." 42

U.S.C. § 9601(24).

Here, Plaintiffs have alleged that they conducted extensive research,

evaluation, sampling, and measuring relating to the release of hazardous

substances at the Site. *See, e.g.*, Dkt. 1 ¶¶ 50, 54-61, 64. Because of their findings,

DEC installed a SSDS on-Site and performed ISCO injections to minimize the

presence of VOCs indoors and to reduce the amount of chlorinated solvents in the

groundwater. *Id.* ¶¶ 73, 77. Additionally, "[c]ourts presume that actions

undertaken by the federal, or a state, government are consistent with the National Contingency Plan." *Niagara Mohawk Power Corp.*, 596 F.3d at 137.

Plaintiffs have alleged sufficient facts to satisfy the fourth and fifth elements and have, thereby, shown that American Locker is liable to them for costs incurred in responding to the release of hazardous substances at the Site during American Locker's ownership.

### B.    Restitution

Plaintiffs also seek restitution under New York law based on their efforts to remediate the contamination attributed to American Locker, which they allege is a public nuisance that American Locker had a duty to abate. *See* Dkt. 1 ¶¶ 97-103.

Under New York law, a public nuisance:

> is an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency. It consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of person[s].

*New York v. West Side Corp.*, 790 F. Supp. 2d 13, 28-29 (E.D.N.Y. 2011).

"[T]he release or threat of release of hazardous waste into the environment unreasonably infringes upon a public right and thus is a public nuisance as a matter of New York law." *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1051 (2d Cir. 1985). Furthermore, Plaintiffs have explained that the release of hazardous substances at the Site resulted in indoor air contamination in nearby homes and had the potential to cause high levels of VOCs throughout the aquifer. Dkt. 1

- 15 -

¶¶ 63, 64. Consequently, Plaintiffs have alleged that American Locker caused a public nuisance.

Everyone "is responsible to the State and the general population not to cause or contribute to a public nuisance and may be required to take ameliorative actions to diminish . . . [any] contribution to the nuisance, regardless of whether the creation of the nuisance was foreseeable or whether defendant's conduct in creating or contributing to the nuisance was wrongful." *People ex rel. Spitzer v. Sturm, Ruger & Co., Inc.*, 309 A.D.2d 91, 113 (N.Y. App. Div. 2003) (citations omitted), *leave denied*, 100 N.Y.2d 514 (2003).

While American Locker did nothing in response to the public nuisance it caused, Plaintiffs spent millions of dollars.  Dkt. 1 ¶¶ 69, 80.  Restitution allows "[a] person who has performed the duty of another by supplying things or services" to be repaid "if (a) he acted unofficiously and with intent to charge therefor[e], and (b) the things or services supplied were immediately necessary to satisfy the requirements of public decency, health, or safety." *West Side Corp.*, 790 F. Supp. at 32 (internal quotation marks and citation omitted).

Taking these principles together, "Plaintiffs adequately pleaded (1) that defendant[] had a duty to abate the public nuisance at the site; (2) that [it] failed to do so; (3) that the state discharged that duty, conferring a benefit on defendant[]; and (4) that defendant[ has] been unjustly enriched." *See id.*; Dkt. 1 ¶¶ 97-103.

In addition, the complaint, read in its entirety, "demonstrates that the services performed by the state in cleaning up the [Site] were immediately

- 16 -

necessary to satisfy the requirements of public decency, health, or safety.  The

complaint surely alleged as well significant . . . groundwater pollution as a result of

the contamination, sufficient to make out a claim for restitution." *Id.* (internal

quotation marks and citations omitted).  *See* Dkt. 1 at ¶¶ 47, 50, 51, 59, 60, 64, 68.

Thus, Plaintiffs have sufficiently shown that they are entitled to restitution

under New York law.[3]

---

[3] Courts have grappled with whether CERCLA's statutory framework preempts
state law causes of action brought to recover or share costs that fall within the scope
CERCLA.  *See MPM Silicones, LLC v. Union Carbide Corp.*, 931 F. Supp. 2d 387,
398 (N.D.N.Y. 2013) ("Like the availability of §§ 107(a) and 113(f) to plaintiffs in
certain procedural circumstances, the issue of whether these two sections preempt
various state-law causes of action has been the subject of much litigation in this and
other circuits.").  Courts have determined that, where New York is seeking to
recover incurred costs from a PRP under Section 107(a), CERCLA does not preempt
Plaintiffs' state law claim for restitution.  *See West Side Corp.*, 790 F. Supp. 2d at 23
("[I]n actions where the state is seeking cost recovery under CERCLA § 107, the
state law remedies of restitution and indemnification are not preempted because
the potential conflict between the state remedies and the settlement framework
under CERCLA § 113 is not implicated."); *New York v. Hickey's Carting, Inc.*, 380 F.
Supp. 2d 108, 114 (E.D.N.Y. 2005) ("In the absence of any true danger that allowing
the State to bring its common law claims for indemnity and restitution alongside its
CERCLA cost recovery action will undermine the settlement incentives set forth in
section 113, *Bedford's* holding does not apply to preempt Plaintiff's common law
claims on the basis of conflict preemption principles.").  Regardless, as discussed
below, the Court concludes that American Locker is liable to Plaintiffs under
restitution principles for costs not recoverable under CERLCA based on the current
record.  *See MPM Silicones, LLC*, 931 F. Supp. 2d. at 401, 405 (describing cases that
found that Section 107(a) does not preempt state law claims even if the state did not
meet certain requirements because such a conclusion would be "akin to a finding of
field preemption," which is "inconsistent with CERCLA's savings clauses") (internal
quotation marks and citations omitted); *Hickey's Carting, Inc.*, 380 F. Supp. 2d at
116 ("Defendants argue that Plaintiff's state law claims should be preempted
. . . because allowing the State to recover under the common law if it should fail to
meet CERCLA's statute of limitations and [National Contingency Plan]
requirements undermines and conflicts with CERCLA's purposes.  The applicable
case law does not support the finding of such a conflict."). *Honeywell Int'l Inc. v.
Buckeye Partners, L.P.*, No. 5:18-cv-646, 2021 WL 1206536, at *4 (N.D.N.Y. Mar. 31,

## II.   **Remaining Issues**

Several issues remain that prevent the Court from calculating the amount to which Plaintiffs are entitled.

### A.   **Off-Site Response Costs**

The Court has concluded that American Locker is a PRP because it is a "person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of."  42 U.S.C. § 9607(a)(2).  Plaintiffs have alleged, and the Court has determined, that the Site—defined as One Industrial Place, Gowanda, New York—is a facility under CERCLA.[4] *See* Dkt. 1 ¶ 83.

Notably, however, Plaintiffs have neither included all contaminated nearby land or property as part of the alleged facility,[5] nor have they explained how

---

2021) (collecting cases in support of contention that "various courts in this Circuit have found that CERCLA does not preempt state common law contribution claims to the extent that they seek to recover costs which CERCLA does not cover").

[4] Plaintiffs have alleged that "[b]uildings, structures, and equipment where hazardous substances were deposited, stored, disposed of, placed, or otherwise came to be located *at the Site* are also 'facilities.'" Dkt. 1 ¶ 84 (emphasis added).  Any buildings, structures, and equipment on the land would be part of the same single facility as the Site.  *See Clear Lake Prop. v. Rockewell Int'l Corp.*, 959 F. Supp. 763, 767–78 (S.D. Tex. 1997) (concluding that the court would have to "abandon the normal usage of the English language" and create an unnatural boundary to find that the laboratory building and the ground underneath it were two distinct facilities).

[5] Courts have "held adjacent properties to be distinct facilities where the properties had different owners."  *Cooper Crouse-Hinds, LLC v. City of Syracuse*, No. 5:16-cv-1201, 2021 WL 4950565, at *17 (N.D.N.Y. Oct. 25, 2021), *reconsideration denied by* 2022 WL 344053 (N.D.N.Y. Feb. 4, 2022); *see also Brooklyn Union Gas Co.*, 480 F. Supp. 3d at 442 ("Despite the broad definition, courts in this Circuit have declined to find that separate parcels that do not share common historical ownership or a

American Locker would be liable under CERCLA for the costs associated with removal or remedial action taken by Plaintiffs on those off-Site properties. Consequently, the Court cannot determine, on the present record, that American Locker is liable under CERCLA for the costs relating to off-Site removal or remedial actions, including, for example, the costs associated with the SSDSs installed in neighboring homes or the ISCO injections that occurred off-Site.

That does not mean American Locker is off the hook. American Locker can remain liable for those costs under Plaintiffs' second cause of action for restitution. This claim, however, is limited by New York's statute of limitations, which this Court can consider *sua sponte* on motion for default judgment. *See De Santis v. City of N.Y.*, No 10 Civ. 3508, 2014 WL 228659, at \*5 (S.D.N.Y. Jan. 22, 2014).

---

common contaminant constitute a single CERCLA 'facility.'"); *Alprof Realty LLC v. Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, No. 09-cv-5190, 2012 WL 4049800, at \*8 (E.D.N.Y. Sept. 13, 2012) ("The cases cited by the Church do not establish that a CERCLA facility must always be defined to include the entire area of contamination, and they particularly do not stand for the proposition that an unrelated neighboring property onto which contamination spreads becomes part of the CERCLA facility."). *But see Yankee Gas Servs. Co. v. UGI Utilities, Inc.*, 616 F. Supp. 2d 228, 270-71 (D. Conn. 2009) ("[A] site with a single source of pollution is almost always considered one 'facility' within the meaning of CERCLA and is generally not divisible absent extraordinary circumstances."); *Cytec Indus., Inc. v. B.F. Goodrich Co.*, 232 F. Supp. 2d 821, 835–36 (S.D. Ohio 2002) ("This court concludes that, where appropriate, the broadest geographical definition of a facility that is appropriate under the specific facts and circumstances of a given case would likely best advance [CERCLA's] two underlying purposes—to ensure prompt and efficient cleanup of hazardous wastes sites and to place the costs of those cleanups on the potentially responsible persons."). Because Plaintiffs have not alleged that the adjacent properties are part of the same facility, the Court does not decide the issue.

- 19 -

New York bars restitution claims after six years of accrual.  In CERCLA-related claims for restitution, the triggering act is each expenditure of funds.  *New York v. Next Millennium Realty, LLC*, No. CV-03-5985, 2007 WL 2362144, at *18 (E.D.N.Y. Aug. 14, 2007).  This means Plaintiffs are barred from recovering from American Locker the funds expended prior to February 2, 2012, for their off-Site efforts.  For example, this would likely include funds associated with DEC's installation of SSDSs in nearby homes in 2004.  *See* Dkt. 1 ¶ 73.  In contrast, Plaintiffs would not be barred from seeking recovery of costs associated with off-Site ISCO efforts, which appear to have first occurred in July 2012.  *See* Dkt. 1 ¶ 77; *see also New York v. Speonk Fuel, Inc.*, 307 A.D.2d 59, 62 (2003), *aff'd* 3 N.Y.3d 720 (2004) (noting that "indemnification accrues—and the six-year limitations period commences—each time the Fund makes a payment for cleanup and removal costs").

Because it is unclear whether the records attached to Plaintiffs' motion include costs related to off-Site efforts and, if so, which entries are related to off-Site efforts, the Court cannot make the appropriate calculations on the current record.

In sum, the Court must conduct a hearing to determine the amount of relief and restitution to which Plaintiffs are entitled.  *See Finkel v. Robco Elec. Corp.*, No. 11-CV-2353, 2011 WL 3204603, at *2 (E.D.N.Y. July 27, 2011) (noting that the court "has an independent obligation to assess requests for damages, which usually must be established by the plaintiff in an evidentiary hearing" (internal quotation marks and citation omitted)); *see* Fed. R. Civ. P. 55(b)(2) (stating that the court may conduct hearings to determine damages).

###### B.    On-Site Response Costs

As noted above, PRPs are liable to states for "all costs of removal or remedial action."  Removal action and remedial action are defined separately and have different statutes of limitations.  *See MPM Silicones, LLC v. Union Carbide Corp.*, 966 F.3d 200, 219 (2d Cir. 2020) ("Over several decades of CERCLA litigation, courts have agreed on a general principle to distinguish the two: removal actions are generally clean-up measures taken in response to immediate threats to public health and safety that address contamination at its endpoint, while remedial actions are typically actions designed to permanently remediate hazardous waste that address contamination at its source. . . . The key distinction between the two terms is immediacy and comprehensiveness.") (internal quotations marks, alterations, and citation omitted).

Suits seeking to recover costs associated with removal actions must be brought within three years of completion.  42 U.S.C. § 9613(g)(2)(A).  Suits seeking to recover costs associated with remedial actions must generally be brought within six years of the initial construction.  *Id.* § 9613(g)(2)(B).  Courts have found that, for each facility, there can be only one set of removal actions and one set of remedial actions.  *Cooper Crouse-Hinds, LLC*, 2022 WL 344053, at *4.

In this case, DEC installed SSDSs on-Site in 2010.  Dkt. 1 ¶ 73.  Here, the installation of the SSDSs constitutes a removal action because DEC installed them to mitigate indoor air impacts exceeding New York State Department of Health guidelines.  *See id.*  In other words, they were installed as a way to address the

threat to public health posed by the underlying hazardous substances rather than as a way to eliminate the presence of the underlying hazardous substances. *See New York v. Next Millenium Realty, LLC*, 732 F.3d 117, 126-27 (2d Cir. 2013) (finding that certain actions were removal measures because they were in response to an imminent public health hazard, and were implemented to minimize and mitigate damage rather than permanently eliminate it). Therefore, to recover the costs associated with the installation and monitoring of the SSDSs on-Site, the present action must have been brought within three years of completion of removal actions.

Because Plaintiffs allege in the complaint that there was continued operation of the SSDSs and continued monitoring of soil vapor, the Court is unable to assess if, and when, such removal actions were completed and whether the statute of limitations would bar recovery of such costs.[6]

It is clear to the Court, however, that the applicable statute of limitations would not bar costs associated with DEC's implementation of a full-scale ISCO remedy on-Site, which began July 2012. The ISCO injection remedy occurred as an attempt to destroy the underlying contaminants and VOCs. Dkt. 1 ¶ 77. This was

---

[6] Courts have suggested that plaintiffs may, under state law claims of restitution, seek costs they are unable to recover under CERCLA because of the applicable statute of limitations. *See New York v. Hickey's Carting, Inc.*, 380 F. Supp. 2d 108, 116 (N.D.N.Y. Mar. 30, 2005) (disagreeing with defendants' argument that state law claims should be preempted when CERCLA's statute of limitations has passed). Nevertheless, the costs incurred prior to February 2, 2012, would be barred under New York's statute of limitations pertaining to restitution claims. The issue may be address at the damages hearing.

a remedial action subject to the six-year statute of limitations. Because the complaint was filed within six years of the start of DEC's full scale ISCO remedy, Plaintiffs are entitled to recover costs associated with these efforts. But because the exhibits provided do not include descriptions of the work completed, the Court is unable to conduct the appropriate calculations and enter a final judgment.

To determine whether Plaintiffs are barred from recovering any of the costs associated with their on-Site removal actions, a hearing is required. Likewise, the Court will need to receive additional evidence in order to make the appropriate calculations regarding the funds Plaintiffs incurred as part of their remedial actions.

## III.   <u>Declaratory Judgment</u>

Plaintiffs also seek a declaration of liability for Plaintiffs' future response costs. Dkt. 1; Dkt. 13. Under 42 U.S.C. § 9613(g)(2), when an action is commenced for recovery of removal or remedial action costs, the Court is required to "enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." Because Plaintiffs have demonstrated their right to a declaratory judgment, the Court grants Plaintiffs' motion for declaratory relief for future response costs incurred under CERCLA.

<u>CONCLUSION</u>

For the reasons stated above, Plaintiffs' Motion for Final Judgment by Default (Dkt. 13) is GRANTED, in part, and DENIED, in part. The Court enters default judgment as to American Locker's liability and grants Plaintiffs' motion for declaratory relief for future response costs incurred under CERCLA. The Court denies Plaintiffs' motion for a final judgment insofar as the Court requires a damages hearing to calculate the appropriate relief to which Plaintiffs are entitled.

Additionally, the Court grants Plaintiffs' motion to dismiss Ruttenberg and directs the Clerk of Court to terminate Ruttenberg as a defendant.

SO ORDERED.

Dated:      March 1, 2022
            Buffalo, New York

_____
JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE