

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

—————————————————

STATE OF NEW YORK, NEW YORK
STATE DEPARTMENT OF
ENVIRONMENTAL CONSERVATION,
and BASIL SEGGOS, Commissioner of
New York State Department of
Environmental Conservation,

                      Plaintiffs,

    v.

AMERICAN LOCKER GROUP INC.,
individually and as successor to
Knowles-Fischer Corporation formerly
known as AVM Corporation formerly
known as Automatic Voting Machine
Corp., and EDWARD RUTTENBERG,

                      Defendants.

—————————————————

1:18-CV-176 JLS (MJR)

REPORT AND
RECOMMENDATION

This case has been referred to the undersigned pursuant to Section 636(b)(1) of Title 28 of the United States Code, by the Honorable John L. Sinatra, Jr., for a Report and Recommendation addressing damages. (Dkt. No. 16) Before the Court is plaintiffs' motion for a monetary judgment. (Dkt. No. 20) For the following reasons, it is recommended that plaintiffs' motion for a monetary judgment be granted.

## FACTS AND BACKGROUND

### *The Complaint*

On February 2, 2018, plaintiffs New York State, New York State Department of Environmental Conservation (the "DEC"), and Basil Seggos, as Commissioner of the DEC, (collectively referred to as "plaintiffs") filed a complaint against American Locker Group, Inc. ("defendant" or "American Locker"), alleging violations of the Comprehensive

Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601-9675 ("CERCLA") and the New York Public Nuisance Law.[1] (Dkt. No. 1) Specifically, plaintiffs sought to recover past and future costs incurred "in responding to the release…of hazardous substances into the environment at and from the premises located at One Industrial Place, Gowanda, New York" (the "Site"). (Dkt. No. 1, ¶ 1) The Site consists of approximately 1.75 acres of industrial/commercial enterprises and structures. (*Id.* at ¶ 22) Adjacent to the Site are residential properties to the north, Thatcher Creek to the east, and Cattaraugus Creek to the west. (*Id.* at ¶ 23)

American Locker owned the Site between 1967 and 1979, using it as a metal stamping and machine shop during that time. (*Id.* at ¶ 25, ¶ 28, ¶ 36) The process generated scrap metal coated with solvents, which American Locker stored, uncovered on the land's surface. (*Id.* at ¶¶ 32-33) As a result, solvents and metal shavings leached from the scrap into the Site's soil and groundwater. (*Id.* at ¶ 34)

American Locker sold the land comprising the Site to Gowanda Electronics Corporation ("Gowanda Electronics") in 1979. (*Id.* at ¶ 36) In 1993, in anticipation of selling the land, Gowanda Electronics conducted an environmental investigation of the Site, including soil excavations and analysis. (*Id.* at ¶¶ 40-42) The excavated soils were sampled and found to contain volatile organic compounds ("VOCs") that exceeded DEC guidance levels. *Id.* Gowanda Electronics also conducted a groundwater investigation,

---

[1] Plaintiffs also named Edward Ruttenberg in the complaint. (Dkt. No. 1) However, plaintiffs did not serve Ruttenberg or otherwise proceed against him. On April 22, 2019, plaintiffs asked that all proceedings against Ruttenberg be dismissed. (Dkt. No. 13-1, pg. 2) On March 1, 2022, the District Court dismissed all claims against Ruttenberg without prejudice, pursuant to Federal Rule of Civil Procedure 41(a)(2). (Dkt. No. 15)

which detected elevated levels of VOCs in the Site's groundwater, resulting in significant groundwater contamination. (*Id*. at ¶ 49)

In 1995, the DEC began investigating the subsurface and groundwater conditions near the Site's area of contamination. (*Id*. at ¶ 50) The investigation identified a groundwater plume migrating from the source of contamination towards a residential property on Torrance Place on the northern boundary of the Site, and the data suggested that the plume likely extended beyond this area. (*Id*.) The DEC then listed the Site in the "Registry of Inactive Hazardous Waste Disposal Sites in New York State" as a Class 2 site, indicating that it posed a significant threat to public health or the environment. (*Id*. at ¶ 51) In 1996, Gowanda Electronics installed a single groundwater extraction well on the Site, which was equipped with a low profile air stripper to treat contaminated groundwater. (*Id*. at ¶ 52) Shortly thereafter, the DEC conducted a "Remedial Investigation" of the Site in two phases, phase one occurring from April to June 1997 and phase two taking place in December 1997. (*Id*. at ¶ 54) The purpose of the Remedial Investigation was to evaluate the nature and extent of soil, groundwater, soil vapor, and indoor air contamination at or emanating from the Site to determine if they posed a threat to human health or the environment. (*Id*.) On January 13, 1998, the DEC entered into a voluntary cleanup agreement with Gowanda Electronics, pursuant to which Gowanda Electronics agreed to continue to operate and monitor the groundwater extraction well at the Site. (*Id*. at ¶ 53) Gowanda Electronics also agreed to provide the DEC with continuing access to the Site for investigation, monitoring of on-site contamination, and any removal and/or remedial actions that may become necessary in the future. (*Id*.)

In 1998, the DEC issued a Remedial Investigation Report, stating that Gowanda Electronics had been largely effective in excavating and removing contaminated soil from the Site. (*Id.* ¶ 55, ¶ 57) However, with respect to groundwater contamination, the contaminated plume covered approximately 7.5 acres and was continuing to migrate northward. (*Id.* at ¶ 58) The DEC report also found that the concentrations of VOCs within the contaminated plume were exceptionally high, indicating that they would act as a continuing source of contamination as they slowly dissolved into passing groundwater. (*Id.* at ¶ 59) The DEC report also showed that the same VOCs present in the groundwater plume were also present in air samples collected from off-Site soil above the plume. (*Id.* at ¶ 60) Indoor air samples collected from off-Site homes located over the groundwater plume were found to be contaminated from this soil vapor. (*Id.* at ¶ 61) Thus, the DEC determined that human beings were exposed to the contamination and that remediation was necessary to protect both human health and the environment. (*Id.* at ¶ 63, ¶ 64)

The DEC solicited public comments and, on March 30, 2001, selected a remedy to address the presence and off-Site migration of hazardous waste disposed of at the Site. (*Id.* at ¶ 68) The remedy selected included the extraction of groundwater through pumping wells and a groundwater collection trench; the treatment and discharge of the collected groundwater; and the installation of a reactive iron wall providing treatment of contaminated groundwater beyond the extent of the extraction system. (*Id.*) In 2002, the DEC contacted American Locker and asked it to enter into an administrative consent order, pursuant to which American Locker would clean-up the contamination both on and off the Site. (*Id.* at ¶ 69) American Locker, however, refused to enter into the consent

order or undertake any remediation or removal action to remedy the contamination that occurred during their ownership of the Site. (*Id.*)

In 2004, the DEC began to investigate and collect information for the design of its selected remedial activities at and around the Site. (*Id.* at ¶ 71) Between April and September 2004, the DEC undertook a pre-design investigation to evaluate existing on and off-Site conditions and to collect information required for the design of selected groundwater remedial activities. (*Id.*) Also in 2004, the DEC installed sub-slab depressurization systems (SSDSs) in nearby homes to mitigate indoor air impacts which exceeded New York State Department of Health guidelines. (*Id.* at ¶ 73) In 2010, the DEC installed a SSDS in a former manufacturing building at the Site. (*Id.*)

In 2011, a new technology, specifically In-Situ Chemical Oxidation Injection (ISCO), became available for the destruction of chlorinated solvents. (*Id.* at ¶ 74) The DEC evaluated this new technology and found that it had greater benefits than the previously selected remedy of extraction and implementation of an iron wall. (*Id.* at ¶ 75) Specifically, the ISCO approach would be highly effective over a shorter period of time with less disruption to the community. (*Id.* at ¶¶ 75-76) In July 2012, from October to November 2013, and from December 2014 to January 2015, the DEC implemented a full-scale ISCO remedy at the on-Site source area and northward within the footprint of the contaminated plume. (*Id.* at ¶ 77) The full scale ISCO injection was successful in destroying a significant amount of Site-related contaminants of concern. (*Id.*) In December of 2017, the DEC issued an "Explanation of Significant Difference" to describe and incorporate information on the ISCO technology into the administrative record. (*Id.* at ¶ 78) The DEC also continued with engineering and institutional controls at the Site,

including the continued monitoring of the groundwater and soil vapor; the continued operation of the SSDSs; restrictions as to the Site's commercial or industrial use; an environmental notice providing the DEC with access to the Site to evaluate ongoing measures; and reporting requirements. (*Id*. at ¶ 79)

According to the complaint, plaintiffs have spent over $4 million in responding to the release of VOCs at the Site. (*Id*. at ¶ 80) Plaintiffs seek recovery of these costs, from American Locker, pursuant to CERCLA and/or through a theory of restitution under the New York State Public Nuisance Law. (*Id*. at ¶¶ 82-96; ¶¶ 97-103)

### *Default Judgment as to Liability and Referral for Determination of Damages*

On February 8, 2018, plaintiffs served American Locker with the summons and complaint in this action, through the New York Secretary of State, pursuant to the requirements of New York Business Corporation Law § 306. (Dkt. No. 7) American Locker failed to appear, answer, or otherwise respond to the complaint. Plaintiffs requested entry of default judgment and the Clerk of the Court entered default as to American Locker on August 6, 2018. (Dkt. Nos.  10, 11) Plaintiffs then moved for default judgment on April 22, 2019. (Dkt. No. 13)

On March 1, 2022, the District Court granted in part, and denied in part, plaintiffs' motion for default judgment. (Dkt. No. 15) Specifically, the District Court held that plaintiffs' allegations were sufficient to establish liability under Section 107(a) of CERCLA, including that American Locker owned and operated the Site at the time hazardous substances were disposed of there; that VOCs—classified as hazardous substances under CERCLA—spilled, leaked or leached into the land, soil, and groundwater at the Site; and that American Locker was liable to plaintiffs for the costs plaintiffs incurred in

responding to the release of these hazardous substances. (*Id.* at pgs. 8-15) The District Court further held that plaintiffs' allegations were also sufficient to entitle them to restitution, under New York state law, for funds plaintiffs spent abating the public nuisance resulting from the hazardous substances released at the Site by American Locker. (*Id.* at pgs. 15-17) The District Court specifically found that plaintiffs sufficiently alleged that American Locker created a public nuisance through the release of hazardous substances at the Site which resulted in indoor air contamination in nearby homes; that defendant had a duty to abate this public nuisance but did not do so; that plaintiffs discharged this duty through the expenditure of funds to abate the nuisance; and that defendant was, as a result, unjustly enriched. (*Id.*) The District Court also granted plaintiffs' motion for declaratory relief for future response costs incurred under CERCLA. (*Id.*)

However, the District Court denied plaintiffs' request for damages because several outstanding issues prevented the Court from properly calculating the amount of damages to which plaintiffs were entitled. (*Id.* at pgs. 18-23) First, plaintiffs did not explain how American Locker was liable, under CERCLA, for response costs incurred at off-Site properties, including the costs associated with the SSDSs installed in neighboring homes and the ISCO injections that occurred off-Site.[2] (*Id.* at pgs. 18-20) Secondly, the District Court found that installation of the SSDSs constituted a removal action and further explained that it was unable to determine if, and when, this removal action was completed

---

[2] The District Court noted that, separate and apart from its liability under CERCLA, American Locker could remain liable for those off-Site costs under plaintiffs' second cause of action for restitution. (Dkt. No. 15, pgs. 19-20) This claim, however, was limited by the applicable statute of limitations, which bars restitution claims filed six years or more after accrual. *New York v. Next Millennium Realty*, LLC, CV-03-5985, 2007 WL 2362144, at *18 (E.D.N.Y. Aug. 14, 2007). As noted by the District Court, if plaintiffs were to recover off-Site response costs under a theory of restitution, plaintiffs would likely be barred from recovering the funds expended prior to February 2, 2012 for their off-Site efforts.

and therefore it was unclear as to whether CERCLA's statute of limitations would bar recovery. (*Id*. at pg. 21-22)[3]

The District Court ultimately entered default judgment as to American Locker's liability under CERCLA and the New York State Public Nuisance Law and granted plaintiffs' motion for declaratory relief for future response costs incurred under CERCLA. (*Id*. at pg. 24) However, the District Court denied plaintiffs' motion for a final monetary judgment in so far as a further hearing was necessary to resolve the issues just described and to calculate the appropriate amount of damages. (*Id*.) The District Court then referred the matter to this Court to conduct a hearing and to issue a Report and Recommendation addressing damages. (Dkt. No. 16)

<u>*Proceedings and Submissions Before this Court*</u>

On April 19, 2022, this Court held a status conference with plaintiffs' counsel to discuss the pending damages portion of plaintiffs' motion for default judgment. (Dkt. No. 17) It was agreed by counsel and the Court that the Court could conduct a hearing on damages through the submission of further motion papers and documentary evidence, including affidavits from individuals with personal knowledge in support of plaintiffs' damages claim, and that an in-person hearing with witnesses was not necessary. (*Id*.) The Court then directed plaintiffs to file a motion in support of their damages request and scheduled a further hearing following the submission. (*Id*.)

---

[3] The District Court also noted that while it was clear that plaintiffs' request for costs associated with on-Site ISCO injections was timely and that plaintiffs were entitled to recover these costs, the exhibits provided by plaintiffs did not include descriptions of the work completed. (Dkt. No. 15, pg. 23) Thus, the District Court was unable to conduct the appropriate calculations and enter a final judgment based on the records presented. (*Id*.)

On August 5, 2022, plaintiffs filed a motion for judgment on the pleadings in support of their request for money damages, which included (1) an affidavit by Robert Strang, an Assistant Engineer in Remedial Bureau E in the Division of Environmental Remediation at the New York State DEC; (2) a DEC cost summary for the Site; (3) a table showing DEC expenditures for personnel time and overhead costs incurred at the Site between March 2005 and February 2022; (4) an "Explanation of Significant Difference", issued by the DEC in December of 2017, which incorporates changes to DEC's Record of Decision as to the Site, specifically with regard to the use of ISCO injection technology and the addition of SSDSs as a further remedy; and (5) a memorandum of law addressing the legal and factual issues regarding damages raised by the District Court in its previous Decision and Order. (Dkt. No. 20) A further motion hearing was held on August 26, 2022 and the Court considered the matter submitted.[4]

## DISCUSSION

Once default is entered, the allegations of the complaint establishing the defendant's liability are accepted as true, except for those relating to the amount of damages. *See Buffalo Laborers Welfare Fund v. H & M Plumbing and Mech. Contracting Inc.*, 14-CV-960, 2015 WL 1735198, at *1 (W.D.N.Y. Apr. 16, 2015); *citing Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). Thus, once a defendant's liability is established by entry of default judgment, the only remaining question is whether there is "adequate evidentiary support" for the damages sought. *Madden v. Bewlwy*, 16-CV-00571, 2017 WL 222245, at *2 (W.D.N.Y. Jan. 18, 2017);

---

[4] Plaintiffs' motion for judgment on the pleadings in support of their request for money damages was served on American Locker. (Dkt. Nos. 21-23) American Locker did not respond to plaintiffs' motion nor have they otherwise contacted this Court. American Locker did not appear at either motion hearing held by this Court to address plaintiffs' request for damages.

quoting *Granite Music Corp. v. Ctr. St. Smoke House, Inc.*, 786 F. Supp. 2d 716, 726 (W.D.N.Y. 2011).

As explained above, the District Court entered judgment in this case finding defendant liable for the release of hazardous materials at the Site, pursuant to both CERCLA and the New York State Public Nuisance Law. (Dkt. No. 15, pg. 24) After reviewing plaintiffs' motion for judgment on the pleadings in support of their request for money damages, including the attached memorandum of law, affidavits and documentary evidence, this Court finds that plaintiffs have provided adequate legal and evidentiary support for their damages request. Thus, for the reasons outlined below, the Court recommends that the District Court grant plaintiffs' motion for monetary relief against American Locker in the amount of **$3,562,808.82**.

*Off-Site Clean-Up Costs*

As explained above, the District Court found that plaintiffs failed to adequately explain how American Locker was liable for plaintiffs' costs related to off-Site clean-up activities. This Court has reviewed the case law and evidentiary submissions provided by plaintiffs and finds that, under CERCLA, defendant is responsible for all of plaintiffs' response costs associated with American Locker's release of hazardous materials, including the costs for clean-up efforts which occurred off-Site.

Under CERCLA, the term "facility" is defined as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, *or otherwise come to be located*." 42 U.S.C. § 9601(9)(B) (emphasis added). Here, the complaint alleges that hazardous substances released on-Site by American Locker eventually came to be located off-Site in the soil and groundwater at neighboring properties. (Dkt. No. 1,

10

¶¶ 58-61) In support of the instant motion for damages, plaintiffs submitted an affidavit by Robert Strang, an Assistant Engineer with the DEC. (Dkt. No. 20-1) Therein, Strang explains how hazardous substances that American Locker disposed of at the Site migrated to the groundwater and soil of neighboring, off-Site residential properties. (Dkt. No. 20-1, ¶¶ 18-28) Some courts have held that "a site with a single source of pollution is almost always considered one 'facility' within the meaning of CERCLA and is generally not divisible absent extraordinary circumstances." *Yankee Gas Servs. Co v. UGI Utilities, Inc.*, 616 F. Supp. 2d 228, 270-71 (D. Conn. 2009); *New York v. Westwood-Squibb Pharm. Co.*, 138 F. Supp. 2d 372 (W.D.N.Y. Dec. 12, 2000). Because the hazardous substances deposited on-Site by American Locker came to be located in the groundwater and soil of neighboring residential properties, there is an argument to be made here that the off-Site properties affected by the pollution are part of the same "facility" under CERCLA, and that defendant is responsible for off-Site clean-up costs on this basis alone. *See also Cytec Indus., v. B.F. Goodrich Co.*, 232 F. Supp. 2d 821, 835-36 (S.D. Ohio 2002) ("[T]he broadest geographical definition of a facility that is appropriate under the specific facts and circumstances of a given case would likely best advance [CERCLA's] two underlying purposes—to ensure prompt and efficient cleanup of hazardous waste sites and to place the cost of cleanups on the potentially responsible parties."); *Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066, 1074 (9th Cir. 2006) (approving "facility" described as "the extent of contamination in the United States associated with the Upper Columbia River" where the hazardous materials had "come to be located" and noting that the term "facility" has "been broadly construed by the courts"); *AxelJohnson, Inc. v. Carroll Carolina Oil Co., Inc.* 191 F.3d 409, 417 (4th Cir. 1999) (the definition of facility applies

not only to traditional waste sites but also to any area where hazardous substances have come to be located) (internal citations and quotations omitted).[5]

Regardless, even if the off-Site properties at issue here are not considered part of the same CERCLA "facility" as the Site owned by American Locker, CERCLA still provides relief for costs incurred by plaintiffs in removing or remediating the hazardous substances that came to be located off-Site as a result of defendants' actions in depositing hazardous materials on-Site. Once a state has established that there has been a release of hazardous materials from a facility, the owner or operator at the time of disposal is liable for "*all costs* of removal or remedial action incurred" by a state so long as those actions are "not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a) (emphasis added). Nowhere in this language does the statute limit recoverable costs to those incurred within the boundaries of a CERCLA "facility." In fact, the National Contingency Plan, which guides removal and remedial actions taken by the EPA or DEC, specifically recognizes that hazardous substances migrate off-site, and further requires assessment of off-site contamination and action to address any such migration. *See* 40 C.F.R. § 300.420(b)(2) (a "remedial [preliminary assessment] shall also include an off-site reconnaissance as appropriate"). *See also* 40 C.F.R. § 300.420(c)(2) (a "remedial [site inspection] shall involve, as appropriate, both on- and off-site field investigatory efforts, and sampling"); 40 C.F.R. § 300.420(c)(5)(3) (a report on the remedial site

---

[5] In contrast, other courts have held that "adjacent properties [are] distinct facilities where the properties have different owners." *Cooper Crouse-Hinds, LLC v. City of Syracuse*, 5-16-CV-1201, 2021 WL 4950565, at *17 (N.D.N.Y. Oct. 25, 2021). *See also Alprof Realty LLC v. Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, 09-CV-5190, 2012 WL 4049800, at * 8 (E.D.N.Y. Sept. 13, 2012) ("The cases cited by the Church do not establish that a CERCLA facility must always be defined to include the entire area of contamination, and they particularly do not stand for the proposition that an unrelated neighboring property onto which contamination spreads becomes a part of the CERCLA facility.").

investigation shall include "[a] description of pathways of migration of contaminants"); 40 C.F.R. § 300.430(a)(1)(iii)(F) ("When restoration of ground water to beneficial uses is not practicable, EPA expects to prevent further migration of the plume, prevent exposure to the contaminated ground water, and evaluate further risk reduction."). Thus, the statutory and regulatory language governing CERCLA suggests that a facility owner is liable for off-site clean-up costs necessitated or caused by the owner's on-site release of hazardous materials.

To that end, courts in this Circuit have recognized that a state is entitled to the costs of cleaning up contaminants that migrate off-site from the facility where the contaminants were released. *See New York v. Next Millennium Realty*, LLC, 732 F.3d 117 (2d Cir. 2013) (the State's costs for cleaning off-site groundwater contamination emanating from the New Cassel Industrial Area were not time-barred); *United States v. Lawrence Aviation Indus., Inc.*, 06-CV-4818, 2019 WL 1259791, at *3 (E.D.N.Y. Mar. 19, 2019) (finding liability for the costs of cleaning up "areas affected by a contaminated groundwater plume moving downgradient and north of the LAI Facility"); *New York v. Next Millennium Realty, LLC*, 160 F. Supp. 3d 485, 526 (E.D.N.Y. 2016) (defendants are liable "for response costs incurred by the State in responding to contamination at and emanating from the [New Cassell Industrial Area], and specifically into the off-site area[.]"); *New York v. Adamowicz*, 16 F. Supp. 3d 123, 144 (E.D.N.Y. 2014), ("defendants are liable for the response costs associated with the downgradient contaminant plume emanating from the Site").

Thus, the Court finds that, under CERCLA, the owner and operator of a facility from which there is a release of a hazardous substance, like American Locker, is liable

for the response costs incurred to clean-up contamination at and emanating from a site, including contamination that traveled to off-site properties. The record before the Court shows that hazardous substances released on-Site by American Locker came to located off-Site, at neighboring residential properties. The record further establishes that plaintiffs' response costs here included removal of contaminants not only at the Site but also at those neighboring residential properties. The off-Site response actions undertaken by plaintiffs included: (1) the DEC's installation of SSDSs (air-cleaning systems) at 18 single family homes located in the neighborhood north of the Site; and (2) the DEC's implementation of an ISCO injection remedy in or around 2012, also within the neighborhood to the north of the Site, and within the footprint of the contaminated plume. (Dkt. No. 20-1, ¶ 20, ¶ 39) The Court finds, based on CERCLA's statutory and regulatory language as well as the facts and cases discussed herein, that American Locker is liable for all costs associated with these off-Site clean-up activities.[6]

_On-Site Clean-Up Costs_

CERCLA recognizes two categories of "response actions" that can be taken in the course of cleaning up a hazardous waste site: "removal actions" and "remedial actions." _See_ 42 U.S.C. § 9601(23) (defining a "removal action" as, generally, "the cleanup or removal of released hazardous substances from the environment"); § 9601(24) (defining a "remedial action" as, generally, "those actions consistent with permanent remedy taken

_____

[6] In the Decision and Order as to liability, the District Court indicted that American Locker was likely liable for off-Site response costs pursuant to plaintiffs' second cause of action for restitution. (Dkt. No. 15, pgs. 19-20) However, any recovery under this theory of liability would be subject to certain statute of limitations restrictions that would likely bar recovery for costs related to the installation of SSDSs off-Site in 2004. However, because the Court has found, for the reasons stated herein, that defendant is liable for all off-Site clean-up costs under CERCLA, it need not directly address this theory of recovery.

14

instead of or in addition to removal actions...to prevent or minimize the release of hazardous substances so they do not migrate to cause substantial danger to...public health or welfare of the environment"). *See also MPM Silicones, LLC v. Union Carbide Corp.*, 966 F. 3d 200, 219 (2d Cir. 2020) ("[R]emoval actions are generally clean-up measures taken in response to immediate threats to public health and safety that address contamination at its endpoint, while remedial actions are typically actions designed to permanently remediate hazardous waste that address contamination at its core."). CERCLA provides different statutes of limitations for removal and remedial actions. A claim for remedial costs must be brought "within six years after completion of the physical on-site construction of the remedial action." 42 U.S.C. § 9613(g)(2)(B). Suits seeking to recover costs associated with removal actions must be brought within three years of completion of the action. *Id.* at § 9613(g)(2)(A). A claim for removal costs is also timely if it is filed with a timely claim for remedial costs and the remedial action was commenced within three years of completion of the removal action. *Id.* at § 9613(g)(2)(B). Removal actions do not have to be quick, and it would not be uncommon for them to take many years. *NL Indus., Inc. v. ACF Indus.*, 10-CV-89, 2014 U.S. Dist. LEXIS 43979 (W.D.N.Y. Mar. 31, 2014).

The District Court determined that the installation of SSDSs constitutes a removal action because the DEC installed them to mitigate indoor air impacts exceeding New York State Department of Health guidelines. (Dkt. No. 15, pgs. 21-22) ("[The SSDSs] were installed as a way to address the threat to public health posed by the underlying hazardous substances rather than as a way to eliminate the presence of underlying

hazardous substances.").[7] However, the District Court was unable to determine, based on the record before it, if and when plaintiffs' removal action, namely the installation and operation of the SSDSs, was complete for purposes of CERCLA's three-year statute of limitations. (Dkt. No. 15, pgs. 21-22) This Court has reviewed the case law and evidentiary submissions provided by plaintiffs and finds that, under CERCLA, plaintiffs' claims for damages incurred for the installation and operation of the SSDSs is timely.[8]

According to Robert Strang, the DEC engineer in charge of overseeing removal and remediation at the Site, the removal action here involved the installation of off-Site SSDSs in 2004 and on-Site SSDSs in 2010. (Dkt. No. 20-1, ¶ 20) Both the on-Site and off-Site SSDSs were used to remove the contaminated soil vapors in order to protect human health and to mitigate the exposure risks directly caused by the contamination at and emanating from the Site. (*Id.*) Strang explains that "[t]he SSDS[s] mitigate potential health impacts by extracting and ventilating sub-slab gases that have volatized from the groundwater plume into the unsaturated soils before they migrate up into the building's indoor air." (*Id.* ¶ 21) Strang further explains that it is essential that these SSDSs removal efforts continue until the remediation of the contaminated groundwater plume is deemed complete because the contaminated groundwater continues to release volatized gases that pose a risk to human health. (*Id.* at ¶ 22) Strang concludes that, because both on-

---

[7] In contrast, the District Court held that the ISCO injection remedy, which occurred as an attempt to destroy the underlying contaminants and VOCS, was a remedial action. (Dkt. No. 15, pgs. 22-23)

[8] The District Court's determination that installation and operation of SSDSs constituted a removal action was made in the context of on-Site removal costs. As stated above, this Court has found that removal costs associated with off-Site SSDSs are also recoverable under CERCLA. Therefore, the statute of limitations analysis conducted herein applies to both on-Site and off-Site removal costs associated with SSDSs, both of which are recoverable by plaintiff here.

Site and off-Site SSDSs are still operating to remove contaminants that "remain present at levels that pose a risk to human health", the "SSDSs removal action continues to date" and "completion is most likely at least several years away." *Id*.

Here, the record before the Court shows that the on-Site and off-Site SSDSs are continuing to remove hazardous substances that remain present in the affected areas, while the DEC continues to conduct the groundwater remediation that will hopefully eliminate the source of the contamination at some time in the future. (*Id*. at ¶¶ 20-22) Because the SSDSs were continuing to remove hazardous air contaminants when this lawsuit was filed on February 2, 2018, the removal action had not been completed and the statute of limitations had not yet begun to run when plaintiffs initiated this action. Thus, plaintiffs' claim for recovery of removal costs associated with the installation and operation of on-Site and off-Site SSDSs is timely. *See Cooper Crouse-Hinds, LLC v. City of Syracuse*, 5:16-CV-1201, 2022 U.S. Dist. LEXIS 20861 (N.D.N.Y. Feb. 4, 2022) (finding the claim for costs incurred from removal action to be timely and noting that, for purposes of CERCLA's statute of limitations, removal actions continue while structures continue to perform their function of abetting the pollution).

Moreover, plaintiffs timely commenced this action within three years of the DEC's incorporation of the SSDSs into its revised remediation plan in 2017. In *Next Millennium Realty, LLC*, the Second Circuit held that a granulated activated carbon absorption system (GAC) installed in 1990 and an air-stripper tower to remove VOCs from groundwater constructed in 1995, both of which remained in operation since, were removal actions and were not barred by the three-year statute of limitations. 732 F.3d at 126. The Court found that these removal measures could not be deemed to have been

17

completed before the State's adoption of a remediation plan that incorporated them in October 2003. *Id.* Since the State commenced its action in March 2006, within three years of its October 2003 adoption of a Record of Decision incorporating the existing GAC and air stripper tower, the Court determined that the statute of limitations had not run as of the time the action was commenced.

Here, the SSDSs were not incorporated into the DEC's original Record of Decision issued in March of 2001. (Dkt. No. 1, ¶ 68) However, in December of 2017, the DEC issued an Explanation of Significant Difference, which, in addition to changing the selected remedy from an iron wall to ISCO injections, incorporated use of the off-Site and on-Site SSDSs. (*Id.* at ¶ 78-79; Dkt. No. 20-4, Exh. C; Dkt. No. 20-5) Plaintiffs filed this lawsuit in February 2018, within three years of the DEC's adoption of a remediation plan that incorporated the removal actions consisting of on-Site and off-Site SSDSs. Therefore, like the plaintiff in *Next Millennium Realty*, plaintiffs' instant claim for removal costs under CERCLA is also timely.[9]

### *Total Damages to be Awarded*

This Court has now fully considered the outstanding legal and factual issues regarding damages identified by the District Court. This Court has concluded that (1) plaintiffs' off-Site response costs are recoverable under CERCLA, including costs incurred for the installation and operation of SSDSs in 18 residential properties adjacent to the Site as well as costs associated with implementation of a full-scale ISCO injection

---

[9] The District Court held that plaintiffs' demand for costs associated with the on-Site ISCO remedial action was timely under CERCLA, since the complaint was filed within six years of the start of the DEC's full-scale ISCO remedy in 2012. (Dkt. No. 15, pgs. 22-23) Since this Court has determined that plaintiffs are entitled to recover off-Site response costs under CERCLA, plaintiffs' claims for damages associated with off-Site ISCO injections, which were also implemented in 2012, is likewise timely.

remedy off-Site; and (2) that plaintiffs' claim for costs associated with the installation and operation of on-Site and off-Site SSDSs is timely under CERCLA. Further, the District Court previously determined that plaintiffs are entitled to recover costs associated with the implementation of their full-scale ISCO remedy on-Site. With the understanding that these are the response costs to which plaintiffs are entitled, the Court now turns to the total calculation of damages requested here.

Plaintiffs request that "this Court award monetary relief in the amount of **$3,562,808.82** against American Locker for CERCLA response costs and/or restitution through March 8, 2022." (Dkt. No. 20-6) In support of this request, plaintiffs submit a detailed and lengthy affidavit from Robert Strang, the DEC project manager responsible for overseeing the remediation and removal activities both on-Site and at the neighboring properties. (Dkt. No. 20-1) The information contained in Strang's affidavit is based upon his personal involvement with clean-up efforts at the Site and surrounding areas as well as his review of DEC files. (*Id.* at ¶ 4) These files include, but were not limited to, a Remedial Investigation Report; a Feasibility Study Report; a Proposed Remedial Action Plan; a Record of Decision; Progress Reports (generally prepared on an annual or semi-annual basis, depending on subject matter); a Final Engineering Report; a Site Management Plan; records of DEC payments to contractors for work performed and costs incurred to investigate, remove and remediate the contamination; DEC employee time records for time spent and costs incurred in connection with investigation, removal, and remediation activities; and DEC staff file notes. (*Id.*) Strang has also examined and is familiar with the official records of the DEC relating to Site Investigation and

Characterization, Removal Action, Remedial Action, Remedial Design, and Remedial Action with respect to contamination at and emanating from the Site. (*Id.* at ¶ 6)

In his affidavit, Strang explains how the total response cost of **$3,562,808.82** is comprised of eight separate categories of remediation and removal costs that were incurred by plaintiffs during their overall response to American Locker's release of hazardous materials at the Site. For each category, Strang provides a detailed explanation of why the specific removal or remedial action was required; a description of the work performed; the dates the work was performed; the contractors used; the DEC contracts pursuant to which the work was conducted; and the amounts and dates of payment by the DEC. The removal and remedial costs described in detail by Strang are as follows: (1) removal costs of **$42,797.83** for SSDSs installed in 18 off-Site residential homes in 2004-2005 (Dkt. No. 20-1, ¶¶ 17-29); (2) removal and remedial costs of **$395,603.02** for the planning, designing, installation, and monitoring of SSDSs in the on-Site manufacturing building; the planning, designing, and engineering services for groundwater extraction and treatment; and assistance with a Pilot Program for the ISCO injection remedy to address contamination, from February 8, 2007 to March 8, 2013 (Dkt. No. 20-1, ¶¶ 30-35); (3) remediation costs of **$2,293,595.47** for labor and materials for ISCO planning and design as well as implementation of the full-scale ISCO injection remedy for the on-Site source area and north in the off-Site residential neighborhood in the footprint of the plume, as well as related hydrogeological and engineering services, from May 6, 2010 through March 6, 2017 (Dkt. No. 20-1, ¶¶ 36-41); (4) remediation costs of **$6,391.88** for labor and materials for groundwater sampling of the contaminated underground water plume to assess the effectiveness of ISCO injections and monitor

residual contamination levels, from February 1, 2018 through August 23, 2019 (Dkt. No. 20-1, ¶¶ 42-44); (5) remediation costs of **$9,918.69** for labor and materials for lab analysis of environmental media to assess reduction of contamination in the groundwater plume and to monitor the progress of ISCO injections in destroying contaminants within the plume, from December 9, 2013 through February 28, 2018 (Dkt. No. 20-1, ¶¶ 45-47); (6) remediation costs of **$345,085.67** for labor and materials to conduct monitoring and oversight work following the ISCO injection; to collect data and groundwater samples; to conduct maintenance; and to prepare a series of reports including a site management plan, health and safety plans, groundwater summary reports, a final engineering report, and other documents related to remediation, from March 8, 2013 through March 8, 2022 (Dkt. No. 20-1, ¶¶ 48-51); (7) remediation and removal costs of **$414,077.26** for personnel costs and overhead costs throughout the project related to DEC employee time spent and DEC resources used to investigate the contamination; to develop, evaluate, and select potential remedies; to participate in the planning, design and implementation of the selected remedial programs; oversee the work of contractors; to communicate with Site owners and property owners; coordinate installation of SSDSs; and to inform the general public of contamination at the Site, from 1997 through 2022 (Dkt. No. 20-1, ¶¶ 52-58)[10]; and (8) remediation and removal costs of **$55,339.00** for costs incurred by the

---

[10] Attached as Exhibit A to Strang's affidavit is a Memorandum from DEC's Bureau of Program Management, dated March 28, 2022, containing detailed information about DEC personnel time spent performing work addressing the contamination at and emanating from the Site, dating back to January 1997, when the subject contamination was first being investigated. (Dkt. No. 20-2) Exhibit B to Strang's affidavit is a table showing DEC expenditures for personnel time and overhead costs from March 2005 until February 2022, broken down by individual two-week time keeping periods. (Dkt. No. 20-3) The same level of detail was not available for the pre-2005 personnel expenditures due to limitations in the DEC's record keeping system for older expenditures. (Dkt. No. 20-1, ¶57, footnote 6)

Department Health ("DOH") in aiding the DEC between 1996 and 2022. (Dkt. No. 20-1, ¶¶ 59-61).[11]

After reviewing Strang's detailed affidavit as well as the documentary evidence attached thereto, the Court finds that plaintiffs have supplied adequate evidentiary support to demonstrate that they are entitled to damages in the total amount of **$3,562,808.82** against American Locker for CERCLA response costs and/or restitution through March 8, 2022.[12]

## CONCLUSION

For the foregoing reasons, it is recommended that the District Court grant plaintiffs' motion for a money judgment (Dkt. No. 20) and that plaintiffs be awarded a judgment of

---

[11] Because the contamination involved potential risks to human health, the DEC coordinated with the DOH at various times during the above-described work. (Dkt. No. 20-1, ¶ 29) The DOH aided with evaluating indoor air quality on-Site and in the nearby homes, coordinating the installation of the SSDSs, and confirming that the SSDSs were effectively mitigating indoor air impacts associated with the contamination. (*Id.*) Underlying employee time entry data and additional information from DOH's timekeeping system for the relevant time period was included in Exhibit A to Strang's affidavit. (*Id.* at ¶ 60)

[12] In its prior Decision and Order as to liability, the District Court noted that while it was clear that plaintiffs were entitled to costs incurred for the on-Site ISCO injections, plaintiffs' exhibits did not include descriptions of the work performed. Plaintiffs have now remedied this issue. As described herein, Strang's affidavit provided detailed descriptions of all the work completed as part of the total response to defendants' release of hazardous materials at the Site, including a detailed description of the work completed and expenditures made with regard to both the on-Site and off-Site ISCO injections as well as the work performed to determine if ISCO injections were a proper remedy, to assess the effectiveness of the injections, and to monitor residual contamination levels within the plume. (Dkt. No. 20-1, ¶¶ 36-51). The Court also notes that some of the expenditures here include work that dates back to 1996, when the subject contamination had first been discovered and was first being investigated. Once it is established that there has been a release of hazardous substances from a facility, the facility owner is responsible for "all costs of the removal or remedial action incurred by a state" so long as they "are not inconsistent with the national contingency plan." *See* 42 U.S.C. § 9607(a). The National Contingency Plan accounts for work done prior to the actual removal or remedial actions themselves and specifically contemplates items such as discovery of the release; remedial and removal site evaluations; establishing remedial priorities; remedial investigation; feasibility studies; selections of remedies; detailed analysis of alternatives; removal actions; and remedial design, action, operation, and maintenance. *See* 42 C.F.R. § 300.405, § 300.419, § 300.415, § 300.420, § 300.425, § 300.430, § 300.435. The Court finds that the work described in Strang's affidavit and exhibits is consistent with the National Contingency Plan.

**$3,562,808.82** against defendants, together with the declaratory relief for future response costs incurred under CERCLA, previously awarded by the District Court in its March 1, 2022 Decision and Order.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby **ORDERED** that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Sinatra, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L. R. Civ. P. 72. Any requests for an extension of this deadline must be made to Judge Sinatra.

*Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.* See Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See* Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988).

*Finally, the parties are reminded that, pursuant to W.D.N.Y. L.R.Civ.P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority."* **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

**SO ORDERED.**

DATED:        March 24, 2023
              Buffalo, New York

HONORABLE MICHAEL J. ROEMER
United States Magistrate Judge